UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DARNELL MACON, SR. and KHARISMA BROOKS,<br>   *Defendants*. | No. 3:21-cr-172 (JAM) |

**ORDER DENYING MOTION TO SUPPRESS**

The defendants have moved to suppress evidence on the ground that law enforcement officers entered their apartment and seized evidence without a warrant and without consent. On the basis of a suppression hearing, I conclude that both defendants voluntarily consented to the officers' entry and seizure of evidence. Accordingly, I will deny their motion to suppress.

BACKGROUND

I make the following findings of fact based on the suppression hearings and related documents.[1] In the summer of 2021, the defendants Darnell Macon, Sr., and Kharisma Brooks came under investigation when a federal firearms dealer alerted the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) that they had come to his gun shop and engaged in a possible "straw" purchase of a firearm.[2]

A straw purchase occurs when a proverbial "strawman" buys a firearm for another person who is not allowed under the law to buy or possess a firearm. The ATF believed that Brooks had possibly acted as a straw purchaser on behalf of Macon who has a prior felony history.[3] After

---

[1] The Government presented testimony from three witnesses over the course of two days of suppression hearings: (1) Barrett Hyde, Special Agent for the New Haven Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); (2) Sam Fuller, Special Agent for the New Haven Office of the ATF; and (3) Paul Carroccio, a police detective for the Danbury Police Department. The defendants did not present any witnesses and relied on affidavits that they filed in connection with their suppression motion. Doc. #130 at 5–8.
[2] Doc. #146 at 12–14.
[3] *Id*. at 12–14, 32; Doc. #150 at 8, 56–57.

receiving the tip from the gun shop, the ATF learned that Brooks had recently obtained a license to buy firearms and that she had bought another firearm at a different location on the same day she had acquired her license.[4]

The ATF decided to interview Brooks about these two firearms purchases.[5] And so on the afternoon of June 7, 2021, two ATF agents joined by two local police detectives went to the apartment complex in Danbury where both Macon and Brooks lived.[6]

The officers were parked outside the complex when Macon drove up, dropped off Brooks who went inside, and then went to park the car.[7] While the two Danbury police detectives engaged Macon in conversation in the parking lot, the two ATF agents approached the front door of the apartment and rang the doorbell.[8] Macon's son answered.[9] The agents asked for Brooks, who came to the door and stepped outside to speak with them.[10] It was a hot day, and they moved to a shaded area next to the apartment complex.[11]

Brooks confirmed that she recently had purchased two firearms, and one of the ATF agents asked her, "Would you show me where the firearms are?"[12] Brooks replied "Sure" in a "very certain manner" and walked back into the apartment.[13]

The two agents followed her inside the apartment and upstairs where they watched as she searched for the firearms in two of the closets of the master bedroom but did not find them.[14] There is no question that Brooks was aware that the agents had entered the house behind her and

---

[4] Doc. #146 at 14–15.
[5] *Id.* at 17; Doc. #150 at 8.
[6] Doc. #146 at 15–16; Doc. #150 at 9.
[7] Doc. #146 at 19–20, 62–63.
[8] Doc. #150 at 9.
[9] Doc. #146 at 20–21; Doc. #150 at 10.
[10] Doc. #146 at 21–22; Doc. #150 at 11, 36–37.
[11] Doc. #146 at 22.
[12] *Id.* at 22–23; Doc. #150 at 11.
[13] Doc. #146 at 23; Doc. #150 at 12, 42.
[14] Doc. #146 at 23, 25–27; Doc. #150 at 14–15.

were accompanying her as she searched for the firearms.[15] The agents followed her as she went downstairs and looked for the firearms in the kitchen but again did not find them.[16]

Brooks then went back out the front door of the apartment and called out to Macon who was still outside and in conversation with the two Danbury police detectives.[17] She stated: "Darnell, where are those guns? Can you find those guns?"[18] Macon then came inside the apartment, and the agents followed him upstairs to the master bedroom where they watched as he retrieved two firearms from a closet and then gave them to the agents who took them outside for safekeeping storage in their car.[19]

The agents entered the apartment again seeking to speak with Brooks, and they went outside to speak with her.[20] Then the agents followed her back into the apartment to interview Macon's son.[21] One of the agents accompanied Macon's son to retrieve a firearm he had in his bedroom.[22]

The agents also wanted to interview Macon but learned that he had left on an errand, and they interviewed him inside the apartment a short time later upon his return.[23] Macon agreed to the interview, stating in effect "All right, let's talk about what's really going on here."[24]

---

[15] Doc. #150 at 67–68.
[16] Doc. #146 at 28; Doc. #150 at 15.
[17] Doc. #146 at 28–29; Doc. #150 at 15–16, 29, 95–96. Agent Hyde testified that he remained inside while Brooks called out to Macon, *see* Doc. #146 at 80, while Agent Fuller testified that he and Agent Hyde went outside again with Brooks, *see* Doc. #150 at 15–16, 68. Whether the agents departed the apartment again or remained does not affect my ruling in this case.
[18] Doc. #146 at 29, 80; *see also* Doc. #150 at 15–16 (testimony without details of exchange between Brooks and Macon).
[19] Doc. #146 at 29–32, 80; Doc. #150 at 16–18.
[20] Doc. #146 at 34, 37, 82–83.
[21] *Id.* at 38, 83–84.
[22] *Id.* at 93; Doc. #150 at 19, 42–43.
[23] Doc. #146 at 39–40.
[24] *Id.* at 74; *see also id.* at 40 ("[H]e said, essentially, 'Okay, like, what's this all about? Let's really talk about it.'").

The two Danbury police detectives also entered the apartment around this time when Macon returned and came inside.[25] The detectives engaged in small talk with Macon, including about his home gym and about a business that he and Brooks ran involving body cream.[26] Macon or Brooks showed the officers a sample body cream from their refrigerator.[27]

Later, the officers conducted a group interview of Brooks, Macon, and Macon's son in the kitchen of the apartment.[28] Prior to this group interview, Agent Hyde returned to his car to retrieve a notebook and a recording device that he used to audio-record the interview without the knowledge or consent of Brooks, Macon, or Macon's son.[29]

At no point did Brooks, Macon, or Macon's son ever expressly invite any of the officers to enter the apartment, and none of the officers ever expressly asked for permission to do so.[30] On the other hand, neither Brooks, Macon, or Macon's son ever objected or raised any concern about the officers' repeated entry or presence in the apartment.[31]

According to the lead case agent on the scene, Brooks, Macon, and Macon's son were trying to be cooperative and to explain themselves, and he believed that he had implicit consent for each of the multiple times that he entered the apartment.[32] Likewise, the second ATF agent testified that he believed that the parties wanted to explain themselves and that he had permission throughout the encounter to enter the apartment.[33]

---

[25] Doc. #150 at 101–02, 118.
[26] Id. at 102–103.
[27] Id. at 103.
[28] Doc. #146 at 34–36, 78; Doc. #150 at 77, 80.
[29] Doc. #146 at 40–41, 56–57, 88–91; Doc. #150 at 19–20, 80. At the suppression hearing, I queried whether there were grounds to challenge the audio recording of the group interview without the defendants' consent. Doc. #146 at 99–100. Because the defendants have not pursued the issue in their briefing, I conclude that they have waived any such challenge.
[30] Doc. #146 at 82–84, 86–87, 96–97; Doc. #150 at 13, 17, 82.
[31] Doc. #146 at 29–30, 38, 40–42, 73, 77, 91–92, 97; Doc. #150 at 14, 20, 83–84, 98, 101–02, 104, 125. Macon raised a concern only that the officers not step on his white carpet. Doc. #150 at 124–25.
[32] Doc. #146 at 86–88.
[33] Doc. #150 at 13, 17, 20, 70, 82, 85.

Although all of the officers were armed, none of them drew or brandished their firearms or otherwise engaged in a show of force.[34] Neither Brooks nor Macon nor his son were placed in handcuffs, arrested, or otherwise detained at any time.[35] As noted above, the evidence shows that Macon departed the scene without incident to run an errand while the officers were there.

The facts as set forth above are my findings and based upon the testimony of two ATF agents as well as one of the Danbury police detectives. I find that their testimony is credible on the basis of the detail and substance of the testimony and on the basis of their demeanor including responses by the two ATF agents to multiple pointed questions that I asked.

The defendants did not testify or present any witness testimony. Instead, both defendants filed affidavits stating that they did not give consent to the officers to enter the apartment.[36] "[W]hile I draw no adverse inference from [their] decision not do so, the fact remains that [their] statements have not been subjected to cross-examination and therefore carry less weight compared to the credible testimony of the government witnesses, which was subject to cross-examination at the hearing." *United States v. Eastman*, 2016 WL 4357492, at *6 (D. Conn. 2016), *aff'd*, 764 F. App'x 58 (2d Cir. 2019).[37]

According to Macon's affidavit, "I saw the officers standing in my doorway – and [they] had entered the apartment without anyone's permission."[38] "I told the officers to leave and go outside the apartment."[39] He further attests that the officers "ordered" Brooks and his son to

---

[34] Doc. #146 at 25; Doc. #150 at 22–23.
[35] Doc. #146 at 29, 33, 35; Doc. #150 at 22, 54, 99–100.
[36] Doc. #130 at 5–8.
[37] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[38] *Id.* at 7 (¶ 6).
[39] *Ibid.* (¶ 7).

"step outside" the apartment, that the officers "took us outside the apartment," and that "[a]t no point did I give the officers permission or consent to enter my apartment."[40]

According to the affidavit of Brooks, she was "surprised to see the police officers standing in our doorway – without permission," and Macon asked the officers "Why are you in my house?"[41] She attests that the "officers stated they wanted to see my firearms and insisted on coming in the apartment," and that "I said you do not have to come into the apartment – and asserted I will get them for the officers."[42] She adds that "I never gave the officers consent to enter my apartment."[43]

I have considered these affidavits but conclude that they are not credible in several respects. Specifically, I find not credible Macon's claim that he told the officers to leave the apartment and that the officers ordered Brooks and his son to step outside the apartment. Likewise, I find not credible Brooks's claim that the officers insisted on entering the apartment, that she told the officers that they did not have to enter the apartment, and that Macon asked the officers why they were inside his house.

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A criminal defendant may move to suppress evidence on the ground that it has been searched or seized in violation of the defendant's Fourth Amendment rights. Although the defendant bears an initial burden to show that he has standing (*i.e.*, that the police engaged in conduct that amounted to a search or seizure of the defendant's person, house, papers, or effects), the burden then shifts to the

---

[40] *Id.* at 7–8 (¶¶ 7–8).
[41] Doc. #130 at 5 (¶ 5).
[42] *Ibid.* (¶ 6).
[43] *Id.* at 5–6 (¶ 6).

Government to prove that any warrantless search or seizure was valid under the Fourth Amendment. *See United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017); *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999).[44]

The Fourth Amendment's warrant requirement does not apply when a person voluntarily consents to a search or seizure. *See United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018). The Supreme Court has explained that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). All in all, the Government must prove that the consent given was a product of the person's free and unconstrained choice rather than a mere acquiescence to a show of authority. *See Iverson*, 897 F.3d at 458.

As the Second Circuit has made clear, "[c]onsent may be express or implied." *Ibid.* Correlatively, "[c]onsent can be found from an individual's words, acts or conduct." *United States v. Frye*, 826 F. App'x 19, 21 (2d Cir. 2020) (quoting *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988)). "Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" *United States v. Grant*, 375 F.

---

[44] More recent decisions of the Second Circuit include statements that could be read to suggest that a criminal defendant bears the entire burden of proof when seeking to suppress evidence under the Fourth Amendment. *See United States v. McKenzie*, 13 F.4th 223, 233 (2d Cir. 2021) (stating that "[t]he burden to show a Fourth Amendment violation rests with the defendant"); *United States v. Peeples*, 962 F.3d 677, 692–93 (2d Cir. 2020) (stating that a defendant "bears the burden of establishing that his rights under the Fourth Amendment were violated and that any unlawfully-obtained evidence should have been excluded from trial"). But these rulings do not cite or acknowledge the prior Second Circuit rulings in *Delva* and *Kiyuyung*, which make a key distinction between a defendant's initial burden to show the occurrence of a search or seizure that affected the defendant's protected interests and the Government's subsequent burden to show that such a warrantless search or seizure complied with the Fourth Amendment. In addition, the factual context of the decisions in *McKenzie* and *Peeples* concerned only whether the defendant had carried the initial burden to show that a search or seizure affecting his Fourth Amendment rights had occurred.

App'x. 79, 80 (2d Cir. 2010) (quoting *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981)).

In addition, a person's subjective belief about whether they have given consent is not dispositive. As for almost all Fourth Amendment inquiries, the validity of consent is governed by an objective reasonableness standard. "It is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government … is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990). Thus, the Supreme Court in *Rodriguez* decided that, even though officers relied on the consent of a person who it turned out lacked actual authority to give consent to search an apartment, there was no violation of the Fourth Amendment if the officers reasonably believed that a person with authority gave consent. *Id.* at 188–89.

Similarly, the Second Circuit has framed the relevant question in the consent context as "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995). No Fourth Amendment violation occurs if "the officer had a reasonable basis for believing that there had been consent to the search." *Ibid*.

Here, in light of these governing legal standards, I conclude that the Government has carried its burden to prove that the defendants voluntarily consented to the agents' multiple entries into their apartment and the seizure of the firearms at issue. At the outset of the encounter, when one of the ATF agents asked to see where the firearms were, Brooks responded "Sure" and walked into the apartment. The officers followed her inside as she looked for the

firearms. Brooks did not object to their entry or their presence at any point, and it was objectively reasonable for the agents to believe that Brooks had consented to their entry.

It was more of the same when Macon entered the apartment, led the agents upstairs, and gave them two firearms from the bedroom closet. The agents reasonably believed that Macon had consented to their entry. Similarly, Macon and Brooks—who were eager to cooperate and to engage in small talk and explain themselves indoors on a hot summer day—impliedly consented to each of the officers' subsequent entries into the apartment for further investigation and interviews.

Nor am I persuaded that the consent was given under duress or any show of authority. The evidence does not show that Macon, Brooks, or Macon's son were threatened or restrained in any manner or that the officers engaged in any show of force or authority to compel or induce them to consent.

The Second Circuit has ruled that there was valid implied consent in circumstances that are similar to this case. *See, e.g., Grant*, 375 F. App'x at 80 (defendant impliedly consented to officers' entry into his apartment when he admitted them into the building and allowed them to follow him into his apartment without objection and in the absence of any force); *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) (upholding finding of consent on basis of district court's determination that person "advised the officers that his identification was inside the house and entered for the purpose of showing them his identification, [such that] he unmistakably invited the officers inside"). Accordingly, I will deny the defendants' motion to suppress.

## CONCLUSION

For the reasons set forth above, the Court DENIES the motion to suppress (Doc. #130).

It is so ordered.

Dated at New Haven this 3rd day of October 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge